IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| JENNIFER DOLAN, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | 1:14cv234 (LMB/TCB) |
| | ) | |
| CAROLYN W. COLVIN, Acting Commissioner, | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM OPINION

Before the Court are the parties' cross motions for summary judgment in this social

security civil action. [Dkt. Nos. 11 and 14]. For the reasons that follow, plaintiff's motion will be

granted, defendant's motion will be denied, the Commissioner's denial of benefits will be

vacated and the plaintiff's claim will be remanded for further fact-finding.

I.    PROCEDURAL BACKGROUND

On June 19, 2006, claimant Jennifer Dolan ("Dolan"), filed her first application for

disability insurance benefits with the Social Security Administration ("SSA"), alleging that her

disability began August 12, 2005. Administrative Record ("R") at 63. Dolan was 36 years old on

the alleged onset date, had three children, and had previously worked for thirteen years as a

mental health technician. R. at 31, 68, 70. It is uncontested that Dolan has suffered from lower

back pain since December 29, 2003 after falling down a flight of stairs. R. at 269. The back pain

worsened over time and Dolan underwent a lumbar fusion on August 12, 2005. R. at 285-86. She

has not worked since August 12, 2005. R. at 192. Dolan claimed to be suffering from

lumbosacral spine degenerative disc disease[1] with an L5-S1 herniated disk, sacrolitis[2] with possible ankylosing spondylitis,[3] migraine headaches, and depression. R. at 65. She reported taking Oxycodone for her pain (having previously taken Hydrocodone) as well as Methotrexate for her hip and wrist pain and Topamax for her migraines. R. at 68. After agency review denied her claims she appeared before an Administrative Law Judge ("ALJ"), who denied her claim on January 22, 2008. R. at 72. Although the ALJ recognized that Dolan suffered from lumbosacral spine degenerative disc disease, sacrolitis with possible ankylosing spondylitis, and depression, rendering her unable to perform her past relevant work, the ALJ found that her reports of personal activity undermined her claims of disabling pain, which were "less than credible." R. at 65, 70. The ALJ also found that Dolan had a residual functional capacity ("RFC") to perform sedentary, unskilled work that existed in significant numbers in the national economy. R. at 67, 71. Dolan appealed that decision to the SSA's Appeals Council ("Appeals Council"), which denied her request for review on January 23, 2009, R. at 73-75. The Appeals Council's action resulted in the ALJ's decision being the final decision of the Commissioner. Dolan timely filed a complaint in the Eastern District of Virginia, which affirmed the Commisioner's finding. Dolan v. Astrue, No. 3:09-cv-156, 2010 WL 773253 (E.D. Va. Mar. 4, 2010). She did not seek further review of that decision.

On November 29, 2010 Dolan filed a new claim for disability benefits, alleging that she has been disabled since January 23, 2009.[4] R. at 10. In her application, Dolan claims to be

---

[1] Essentially, systemic degeneration of the disks in the lower back. See Dorland's Illustrated Medical Dictionary, 759, 1166 (W.B. Saunders Co., 26th ed. 1981).
[2] Sacrolitis is characterized by inflammation in the joints of the lower back. Id. at 1166.
[3] Ankylosing spondylitis is a disorder characterized by back inflammation, back pain, back stiffness, forward rounding of the back ("kyphosis"), and eye inflammation. The Merck Manual, 290-91 (Mark H. Beers et al. eds., 18th ed. 2006).
[4] The new onset date is the date of final administrative action on her first application.

suffering from ankylosing spondylitis, degenerative lumbar disc disease,[5] radiculopathy,[6] chronic

pain and depression. R. at 191. When she filed this claim, Dolan was taking eleven different

medications regularly, including MS Contin, Neurontin, Percocet, and Ultram for pain,

Methotrexate and Prednisone for ankylosing spondylitis, and Soma and Valium for spasms. R. at

194. During the claimed period, Dolan also received numerous epidural steroid injections in

attempts to address her pain. R. at 532, 533, 536, 537. Her application was denied initially on

April 12, 2011 and denied upon reconsideration on August 15, 2011. R. at 10.

On October 4, 2012 Dolan, represented by counsel, testified before ALJ Maria Alexander

Nunez. R. at 21. In a decision issued three weeks later, the ALJ found that Dolan was not

disabled at any time between January 23, 2009, the alleged onset date, and December 31, 2010,

the date last insured. R. at 20. Using the five-step analysis prescribed by 20 C.F.R. § 404.1520

for evaluating claims for disability benefits, the ALJ made findings that Dolan (1) had not

engaged in substantial gainful activity since the alleged onset of her disability; (2) had severe

impairments, including degenerative disc disease, ankylosing spondylitis, and depression; (3) did

not have a severe impairment meeting the criteria listed in 20 C.F.R. Part 404, Subpart P,

Appendix 1; (4) did not have the residual functional capacity to perform her past relevant work;

but (5) retained residual functional capacity to perform a range of sedentary, unskilled work

allowing alternation between sitting and standing every 30 minutes, sitting six hours out of an

eight hour workday, with restricted lifting requirements, and limited to simple, routine tasks. R.

at 12-19. Further, the ALJ found that although Dolan's impairments could reasonably be

expected to cause the symptoms that she claimed to experience, Dolan's description of her

---

[5] Degeneration of the disks in the lower back. Dorland's Illustrated Medical Dictionary, supra
n.1, at 759.
[6] Radiculopathy is a disease of the nerve roots. Id. at 1109.

symptoms was not credible. R. at 15. Based on the testimony of the vocational expert, the ALJ

found that there were several representative examples of jobs in the national economy that a

person with Dolan's residual functional capacity could perform on a sustained basis, including

positions as a dowel inspector, security system monitor, and quality control. R. at 19-20. Given

those findings, the ALJ concluded that Dolan was not disabled. R. at 20. Dolan appealed that

decision to the Appeals Council, which denied Dolan's request for review on January 8, 2014. R.

at 1. That decision rendered the ALJ's decision the final decision of the Commissioner. Dolan

timely filed her complaint for review of that decision in this court on March 6, 2014. [Dkt. No. 1]

("Complaint"). The parties have submitted cross-motions for summary judgment.

## II.    DISCUSSION

Plaintiff centers her arguments on the ALJ's conclusion that Dolan's description of her

degree of pain and its effects on her ability to function, lacked credibility. See Plaintiff's

Memorandum In Support Of Motion For Summary Judgment [Dkt. No. 12] ("Dolan's Br.") at

15-25. The ALJ concluded that Dolan's testimony was not credible in light of Dolan's March

2011 Function Report, finding that "the level of activity [described in the Function Report was]

inconsistent with the severity of [the] limitations expressed at the hearing." R. at 15, 18, 200-220.

Additionally, the ALJ found that the course of medical treatment during the relevant period was

"routine and conservative," and that "objective findings have been stable and relatively mild." R.

at 18. Both findings, the ALJ opined, were "inconsistent with the severity of his (sic)

allegations." Id.

Dolan argues that those conclusions are not supported by substantial evidence, and that

even if the objective medical findings have been that her condition is "stable and relatively

mild," the ALJ cannot deny Dolan disability "based on objective medical findings, alone."

4

Dolan's Br. at 6, 22-25. Lastly, Dolan argues that the process by which the ALJ made her credibility finding denied Dolan due process of law because she was not given an opportunity to address any doubts that the ALJ had arising out of the Function Report. Id. at 26-27.

## A. **Standard of Review**

When a social security claimant appeals the Commissioner's final decision to deny disability benefits, judicial review by the district court is limited to determining whether, based on the entire administrative record, the Commissioner's decision is "supported by substantial evidence and whether the correct law was applied." Walls v. Barnhart, 296 F.3d 287, 290 (4th Cir. 2002); see also 42 U.S.C. § 405(g). Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla but may be somewhat less than a preponderance." English v. Shalala, 10 F.3d 1080, 1084 (4th Cir. 1993) (internal quotation marks omitted). In determining whether an agency's conclusion is supported by substantial evidence, the Court "must take into account whatever in the record detracts from" the agency's conclusion. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951).

"When factual findings rest upon credibility determinations, they should be accepted by the reviewing court absent exceptional circumstances." Eldeco, Inc. v. NLRB, 132 F.3d 1007, 1011 (4th Cir. 1997) (internal quotation marks omitted). This is not to say that credibility determinations are immune from review. A court should accept an ALJ's credibility determination unless it is "unreasonable, contradicts other findings of fact, or is based on an inadequate reason or no reason at all." Id. (internal quotation marks omitted). In that situation, a reviewing court is "free to review the record and independently reach its own conclusions." Id. If an ALJ determines that a claimant's testimony is inconsistent with other evidence about the

claimant's activities, a court should not credit the ALJ's determination if "the record, when read as a whole, reveals no inconsistency." Hines v. Barnhart, 453 F.3d 559, 565 (4th Cir. 2006). If the claimant's testimony is not inconsistent with the record as a whole, then the ALJ's determination is not supported by substantial evidence and cannot stand. See id. at 566. As with other agency action, the Court must review the ALJ decision based on the grounds articulated by the ALJ. SEC v. Chenery Corp., 318 U.S. 80, 88 (1943).

### B. Procedure for Determining Disability

In considering whether a claimant is disabled, the SSA must determine whether (1) the claimant is engaged in substantial gainful activity; (2) the claimant has a medical impairment (or combination of impairments) that are severe; (3) the claimant's medical impairment meets or exceeds the severity of one of the impairments listed in Appendix I of 20 C.F.R. Part 404, subpart P; (4) the claimant can perform her past relevant work; and (5) the claimant can perform other specified types of work. Johnson v. Barnhart, 434 F.3d 650, 653 n.1 (4th Cir. 2005) (per curiam); 20 C.F.R. § 404.1520. The plaintiff has the burden of establishing the first four steps. If that burden is met, as is it was in this case,[7] the SSA has the burden of establishing "that the claimant, despite her impairments, can perform a significant number of jobs in the national economy." Id. at 653 (internal quotation marks omitted). That conclusion "implicitly contain[s] a finding that [the claimant] physically is able to work an eight hour day," Hines, 453 F.3d at 563; however, a claimant may be unable to work, and may therefore be disabled, because the claimant suffers from "pain . . . so continuous and/or severe that it prevents [the claimant] from working a full eight hour day." Id. at 565. Simply alleging disabling pain is not enough. The claimant must show "by objective medical evidence a medical impairment reasonably likely to cause the pain

---

[7] Both sides agree that Dolan's evidence satisfied the first four steps of the analytical framework for determining whether a claimant is disabled, and the Court accepts that conclusion.

claimed." Craig v. Chater, 76 F.3d 585, 595 (4th Cir. 1996). Once the claimant puts forward

evidence of an impairment that could cause the pain, the claimant may rely on purely subjective

evidence to show that she, in fact, suffers from disabling pain. Id. If the claimant puts forward

unrebutted evidence to that effect, then benefits should be awarded. Hines, 453 F.3d at 562, 566.

It bears emphasizing that at step five, the burden is on the SSA to prove that "the claimant

remains able to work other jobs available in the community." Id. at 567.

### 1. Findings Inconsistent with the Function Report

The ALJ found Dolan's claims of disabling pain not credible primarily because, in the

ALJ's view, Dolan's testimony was inconsistent with her report of activity in the Function

Report that she filed. R. at 18. Upon closer inspection, however, no such inconsistency appears.

To illustrate the point, the following table sets forth the ALJ's characterization of Dolan's

functioning, Dolan's actual statements contained within the Function Report, and Dolan's

testimony before the ALJ at the hearing.

| ALJ Decision (R. at 15, 18) | Function Report (R. at 200-20) | Hearing Testimony (R. at 21-59) |
|---|---|---|
| "[Dolan] reported caring for pets" | "I water [and] feed them [and] let them in [and] out of the house . . . My sons [and] husband also help water [and] feed them [and] let them in [and] out. They also walk the dog." R. at 201. | No hearing testimony. |
| "[Dolan] reported . . . preparing simple meals daily" | "Cereal for breakfast. I usually skip lunch. When I do make dinner, it is usually preprepared, microwaveable food [and] fries . . . I make dinner once or twice a w[ee]k, [taking] 5 – 10 minutes . . . I cook way less [and] make meals that are much easier . . . On the days that I don't prepare meals it is [because] the pain is too intense [and] I need to rest and lay down." R. at 202. | "Q: Were you able to cook? A: There was a lot of days that I did not, that I could not. Q: So in an average week how many days were you cooking? A: Maybe two. Q: And what kinds of meals were you preparing on those days? |

| | | A: Meals that were frozen or boxed, something easy.<br>Q: And who cooked on the days you didn't?<br>A: My husband." R. at 40. |
|---|---|---|
| | "My husband gets home [at] 5:30. He usually gets dinner ready [because] by then I hurt too much." R. at 207. | |
| "[Dolan] reported . . . shopping for groceries, household goods, and clothing" | "I dread shopping because it causes so much pain [and] takes all day to recover, sometimes into the next day . . . I have 1 large shopping trip a month at Costco. I'm usually gone @ [sic] 1 ½ hours [and] have help. I have smaller 45 min trips every [week] or [two] that I can do alone." R. at 203.<br><br>"If there are errands to run, I'll save them for a day that I'm up to doing them. I'll go out midday when I'm still in pain, but not as bad as morning or evening. There is usually a 2 or 3 [hour] window when I'm able to get things done." R. at 207. | "Q: . . . [Y]ou mentioned that you'd go to the grocery store I think you said once a week. Is that correct?<br>A: Uh-huh.<br>Q: Other than to the grocery store, how often would you go to other stores if the kids needed sneakers or if you needed clothing or - -<br>A: Thrift stores. Probably thrifting maybe twice a month.<br>Q: Is that something that you enjoy to do?<br>A: I do, yeah.<br>Q: Might you spend the whole day thrifting?<br>A: Oh, no. No.<br>Q: How much time would you spend thrifting?<br>A: Maybe 45 minutes." R. at 44. |
| "[Dolan] reported . . . driving" | "I always find someone else to drive for longer trips [because] even if I feel okay when I leave, I usually won't for the trip home. My 74 [year old] father will drive 1 ½ hours to [Fredricksburg] from Lessburg to take me another 1 hour to Richmond for [doctor appointments]. I drive [around] town, but if the trip is an hour or more, I need a driver or I risk getting stuck somewhere." R. at 203. | "Q: . . . Were there other things that brought on your pain or made your pain feel worse?<br>A: Driving . . ." R. at 38-39.<br><br>"Q: Were you able to drive?<br>A: Yes. I can drive with limitations.<br>Q: How often would you have driven before the |

8

| | | |
|---|---|---|
| | "The vibration in the car, sitting for long [periods] in the same position, and the seat pressing against my back all make driving uncomfortable . . . . Even [with] frequent stops, driving really gets to me. The vibration makes my back spasm. I get shooting pains down my legs. I find myself sitting on the very front of the seat so my back isn't touching anything, just moaning [because] it hurts too much. Even if I stop [and] walk . . . for a few min[utes], the pain will continue a few min[utes] after getting back in the car." R. at 214-5. | end of 2010 in a week?"<br>A: I would maybe go out two times a week.<br>Q: And where would you go?<br>A: To grocery stores or to run errands." R. at 41.<br><br>"Q: . . . Over the period of 2009 to 2010, can you estimate for us how often you would end up canceling [doctor's] appointments?<br>A: Oh, probably 30/40 percent of the time. My doctors were out of town often times, so if I couldn't do the drive I just couldn't do it." R. at 46. |
| "[Dolan] reported . . . reading, completing crossword puzzles and Sudoku, knitting, and watching television." | "I need to sit or lay down a lot throughout the day. I do [crossword] puzzles, Sudoku, or solitaire daily." R. at 204<br><br>"I knit a couple times a [week] when my hands aren't sore." R. at 204. | "Q: Were you spending any time reading or watching television?<br>A: Yes<br>Q: What were you doing?<br>A: Reading or watching television.<br>Q: Well, reading or watching television? Were you reading?<br>A: Either one. Yeah. I'd do both." R. at 41-42.<br><br>"Q: . . . [I]f you could read for two to three hours, watch TV for two to three hours, work crossword puzzles for 30 minutes in the morning and 30 minutes in the evening, why couldn't you work?<br>A: Because I can't - - the times that I can do that |

| | | |
|---|---|---|
| | | just depends on how I'm feeling at the moment. There's no way I would get through an eight hour long day doing anything even on a good day. The pain affects my concentration." R. at 48. |
| "[Dolan] reported visiting with others" | "Visit in their homes, talk on the phone or text, <u>occasionally</u> go on outings, usually just to a store or restaurant. . . . [V]isits once a month or once every few months." R. at 204.<br><br>"I'm unable to drive distances [and] then back again so day visits aren't possible if friends are out of town." R. at 205. | "Q: Were you spending any time visiting with friends or family members? A: Yes. Q: What were you doing? A: I had a neighbor that I really got along with well and would sometimes go over there when she got home from work. Q: How often were you doing that? A: Maybe once a week for - - Q: When you went over there what did you do? A: - - 45 minutes or so. We would talk." R. at 43. |
| "[Dolan] reported . . . talking on the phone" | "Phone calls every few days, text every few days." R. at 204.<br><br>"I don't talk on the phone in the eve[ning because] I'm too tired [and] in too much pain." R. at 205. | No hearing testimony. |
| "[Dolan] reported . . . occasionally going out to eat." | Goes "[n]owhere regularly besides the grocery store [and] monthly (or every other month) to the d[octor]s." R. at 204. | "Q: Did you ever go out to dinner with your husband or your kids or your kids or to the mall or to the movies or out to visit and have dinner with friends? A: Not with friends. Every once in a while - - we didn't really have |

| | | very much money, so our going out was very limited. Every once in a while we would go out to eat or to a movie, but, like I said, it didn't happen very often.<br><br>Q: Every once in a while is? Give me a rough estimate.<br><br>A: I'm sorry. Movies maybe twice a year. Going out to eat maybe six times a year." R. at 44. |
|---|---|---|
| "[Dolan] reported that she oversaw the care of her 3 sons . . . preparing snacks and sandwiches" | "I help prepare easy snacks [and] sandwiches on the [weekend]." R. at 208. | "I think basically what I do around the house is laundry and I help make a meal." R. at 50. |
| "[Dolan] reported . . . doing laundry" | "I do some of their laundry, though I am <u>very</u> behind [because] I haven't been up to doing it lately." R. at 208.<br><br>"I'm only doing 10-20 min[ute]s of laundry at a time [because] its (sic) all I can handle." R. at 212. | "Q: Were you doing the laundry?<br>A: With help.<br>Q: Whose help?<br>A: My sons or my husband<br>Q: How often were you doing the laundry?<br>A: Maybe once a week." R. at 41. |
| "[Dolan] reported . . . washing dishes" | "I wash their dishes." R. at 208.<br><br>"If I'm able I'll work on the kitchen w[ith] frequent breaks to sit [and] rest." R. at 207.<br><br>"I do most of the dishes but the boys put them away." R. at 212. | "Q: Were you washing the dishes or loading and unloading the dishwasher?<br>A: Yes. We would both do that." R. at 40. |
| "[Dolan] reported . . . doing minor cleanup." | "Cleaning can only be done on days that I'm physically able to do it. In a 'normal' week, I can do some cleaning 3-4 days a week. If I'm having a flare up of A.S. symptoms, I'm unable to do anything or go anywhere for 1 ½ to 2 weeks. . . . Cleaning piles up | "Q: Were you doing any of the housework? . . .<br>A: I would clean the kitchen, I didn't do much. The vacuuming, it was something that I used to be able to do, and it just got to the point |

| | as I often have to put it off. The house is never clean, though a room or 2 maybe. I clean in spurts w[ith] frequent rests so getting the kitchen done (or done enough) takes hours. Actual cleaning time is much less, done in 10-15 min[ute] increments. R. at 212.<br><br>"I'm never able to do more than 2-3 hours a day." R. at 213. | that I was doing it less and less, that I could do it less and less. . . . The house was pretty bad." R. at 40-41.<br><br>"Q: How many good days were you having in an average week? A: Maybe two or three." R. at 34. |
|---|---|---|
| "[Dolan] reported supervising [her sons'] homework, meeting with teachers, and going to their doctor appointments." | Verbatim from Function Report. See R. at 208. | No hearing testimony. |
| "[Dolan] indicated that she did an exercise program on the Wii videogame system." | "I can't afford physical therapy but do have an exercise program on the Wii system." R. at 219-20. | No hearing testimony. |

This Court is mindful of the admonition that "[w]hen factual findings rest upon credibility determinations, they should be accepted by the reviewing court absent exceptional circumstances." Eldeco, 132 F.3d at 1011 (internal quotation marks omitted). But "the record, when read as a whole, reveals no inconsistency between" Dolan's testimony and the Function Report. Hines, 453 F.3d at 565. Indeed, the only inconsistency is with the ALJ's characterization of Dolan's activities. Although the Commissioner is, of course, correct that "[t]he ALJ is not required to extract word-for-word [Dolan]'s claims asserted in her function report," Memorandum In Support Of Defendant's Cross Motion For Summary Judgment [Dkt. No. 15] ("Commissioner's Br.") at 19, the ALJ must "summarize" the function report accurately. Hines, 453 F.3d at 566. The ALJ describes Dolan's activities in a way that ignores her allegations of pain and the resulting difficulties that she experiences. For example, Dolan reported that "[e]ven [with] frequent stops, driving really gets to me. The vibration makes my back spasm. I get shooting pains down my legs. I find myself sitting on the very front of the seat so my back isn't

touching anything, just moaning [because] it hurts too much." R. at 215. The ALJ summarized

this testimony simply as "[Dolan] reported . . . driving" and used that statement as part of her

justification for finding Dolan not disabled. R. at 18. This mischaracterization of Dolan's

Function Report creates the impression that Dolan testified that she could drive normally.

Dolan's testimony at the hearing was more consistent with how she described her functions in

the Function Report, than it was with the ALJ's summary.

### 2. Routine and Conservative Treatment

The ALJ also found that Dolan's reports of disabling pain were not credible because

Dolan's "course of medical treatment has been routine and conservative." R. at 18. To prevail,

this finding must be supported by substantial evidence.

Dolan argues that "[i]t is of no consequence as to what label the ALJ chooses to place on

[the] treatment," and all that matters is "whether Ms. Dolan's treatment regimen 'can reasonably

be accepted as consistent with' the symptoms she alleges." Dolan's Br. at 19 (quoting 20 C.F.R.

§ 404.1529(c)(3)(v)). The Commissioner responds that the nature of a claimant's treatment is

relevant, and that because Dolan's treatment "did not include back surgery or consistent use of

an assistive device" the ALJ's conclusion was appropriate. Commissioner's Br. at 19-20. In her

reply, Dolan admits that the nature of a claimant's care is relevant, but argues that the ALJ erred

by not providing "some definition of what constitutes 'routine and conservative.'" Reply Br. at 3.

The nature of a claimant's treatment is clearly relevant under SSA regulations. Gross v.

Heckler, 785 F.2d 1163, 1165-66 (4th Cir. 1986); 20 C.F.R. § 404.1529(c)(3). Although

articulated as attacking the "definition" of routine and conservative treatment, Dolan's point

seems more that the ALJ did not articulate why she viewed Dolan's treatment as routine and

conservative. As the ALJ's decision is reviewed only on the basis that the ALJ provided, if the

ALJ provided no basis for her decision then the decision cannot be based on substantial evidence. Nat'l Elec. Mfrs. Ass'n v. U.S. Dep't of Energy, 654 F.3d 496, 513 (4th Cir. 2011); Chenery, 318 U.S. at 88. This Court is mindful, however, that "if the decision is overwhelmingly supported by the record though the agency's original opinion failed to marshal that support, then remanding is a waste of time." Bishop v. Comm'r of Social Sec., 2014 WL 4347190, at *2 (4th Cir. Sept. 3, 2014) (internal quotation marks omitted).

The ALJ does not cite any evidence for her conclusion that Dolan underwent routine and conservative treatment. See R. at 18. Neither does the record support that conclusion. At no point does any doctor describe Dolan's numerous epidural steroid injections as routine or conservative. See R. at 76-109. Neither SSA doctor mentioned Dolan's treatment regime at all in concluding that she was not disabled. See R. at 83, 101. Further, the Fourth Circuit has suggested that epidural injections are not conservative treatment. Murray v. Shalala, 51 F.3d 267, at *1 (4th Cir. March 31, 1995) ("When conservative treatment failed to improve [claimant's] condition," doctors prescribed a course of three epidural injections). The mere fact that Dolan's treatment regime did not include back surgery or consistent use of an assistive device does not, without more evidence, mean that the treatment was routine or conservative – particularly in Dolan's case, where the treatment involved repeated epidural injections as well as consistent prescriptions for Schedule 1 narcotic pain relievers.

The record makes clear that the process for administering an epidural is invasive. The skin is raised chemically and the area anesthetized. R. at 532. Then, a needle 3.5 inches long is inserted into the spinal disc in question. Id. Dye is injected into the disc to observe the area in question. Id. Finally, painkiller is injected directly into the spinal disc. Id.

In addition to epidural injections, Dolan also underwent provocative discography. That procedure is even more invasive than epidural injections. After the skin is raised chemically, and the area anesthetized, a needle 3.5 inches long is inserted into the spinal disc in question, and a second, 7 inch needle is then inserted into the nucleus of the disc, and dye injected. R. at 534. The process is repeated three times. Id. On April 2, 2009 alone, Dolan's doctor inserted a 3.5 inch needle directly into her spine, and used that needle to also insert a 7 inch needle into her spine, four times. Id.

Because there is no support in the record for the ALJ's conclusion that Dolan underwent routine and conservative treatment, that aspect of the ALJ's conclusion is not supported by substantial evidence.

### 3. Objective Medical Findings

Dolan's credibility as to disabling pain was also discounted because of what the ALJ described as "stable and relatively mild" objective medical findings. R. at 18. Dolan argues that the ALJ's determination of non-disability cannot be supported on this rationale alone, as allegations of severe pain may not be rejected simply because there is no objective evidence of pain. Craig, 76 F.3d at 595. Dolan also argues that the finding that her objective symptoms have been stable and mild contradicts the ALJ's finding that Dolan's conditions could reasonably cause her pain. Dolan's Br. at 24. The Commissioner responds that the ALJ may consider the objective medical evidence, particularly when determining whether the objective medical evidence contradicts Dolan's claims of pain. Commissioner's Br. at 21. The Commissioner argues that the medical evidence in the record directly contradicts Dolan's testimony. Id.

Resolving this issue requires the Court to look closely at how the ALJ used the finding that Dolan's symptoms had been "stable and relatively mild." If, as Dolan argues, the ALJ found

15

that Dolan's claims of pain were not credible because there was no objective evidence of pain, then that rationale alone could not justify the ALJ's conclusion under Craig. If, instead and as the Commissioner argues, the ALJ merely considered the progression of Dolan's objective findings in determining that Dolan's claims of pain were not credible, then the Court must examine that conclusion for substantial evidence.

Here, the ALJ used the progression of medical findings to evaluate whether Dolan was in fact experiencing the pain that she claimed. See R. at 18. The ALJ did not, as Dolan argues, find that Dolan's claims of pain were not credible because they were unsupported by objective evidence of pain. Instead, the ALJ found that Dolan's claims of pain were contradicted by the objective medical evidence of her condition remaining stable. R. at 18.

The ALJ does not identify which findings she relies on to find that the "objective findings have been relatively stable." R. at 18. The ALJ seems to be referring to the elements of Dolan's medical history, indicating that Dolan routinely tested at a 5/5 in numerous limb tests. R. at 15-17. Yet the record does not establish how consistent 5/5 findings undercut Dolan's claim of disabling pain. Nowhere in the record, other than the ALJ's bald conclusion, is there any indication that the test results contradict Dolan's claim that she suffers disabling pain. Neither SSA doctor found that Dolan's "stable" medical evidence affected her credibility. See R. at 83, 101. Moreover, there is not a single medical record in this file which does not reflect Dolan complaining of pain ranging from 5 on a scale of 0 to 10 to as much as 7 to 8. And no doctor questioned the consistent prescription of narcotic medication such as Percoset and MS Contin to address Dolan's pain.

On this record, none of the reasons cited by the ALJ for finding that Dolan's claim of disabling pain lacked credibility are supported by substantial evidence. Accordingly, the Court

16

finds that the ALJ's conclusion that Dolan's claims of disabling pain lacked credibility is not supported by substantial evidence.

The record shows that the ALJ and the SSA physicians all gave "great weight" to the previous ALJ's determination of plaintiff's residual functional capacity, which was affirmed by another judge in a different division of this district. R. at 18, 84, 101. The record before that judge was not filed in this case, and therefore, has not been considered by this Court. Moreover, Dolan has claimed different disabilities in this civil action, and claimed a different period of disability as well. Therefore, it would be unfair to judge the merits of this claim on the basis of the previous claim. In any event, this Court's holding is limited to a finding that on the record in this civil action, the ALJ's conclusion that Dolan's claims of pain lacked credibility is not supported by substantial evidence.

### C. Due Process

Dolan argues that the ALJ denied her due process of law by not informing Dolan that the ALJ "planned to use the Function Report answers in the manner" that the ALJ did. Dolan's Br. at 27. Dolan argues that, in effect, she was never offered a meaningful opportunity to address the ALJ's reliance on those answers. Id. The Commissioner responds that SSA regulations allow the ALJ to consider the Function Report in deciding whether a claimant can adjust to other work in the national economy, among other things. Commissioner's Br. at 23. In essence, Dolan argues that the ALJ violated her due process rights by not sharing the ALJ's views of the evidence, "at least those she deems unfavorable to the claimant, at the time of the hearing." Reply Br. at 6.

"The dictates of the due process clause depend upon the nature of the private interest, the adequacy of the existing procedure in protecting that interest, and the governmental interest in the efficient administration of the applicable law." Thomason v. Schweiker, 692 F.2d 333, 336

(4th Cir. 1982) (citing Mathews v. Eldridge, 424 U.S. 319, 335 (1976)). Weighing the Mathews factors, Dolan's due process rights were not violated. Regarding the first factor, "the hardship imposed upon the erroneously terminated disability recipient may be significant. Still, the disabled worker's need is likely to be less than that of a welfare recipient." Mathews, 424 U.S. at 342. Further, "[i]n addition to the possibility of access to private resources, other forms of government assistance will become available where the termination of disability places a worker or his family below the subsistence level." Id. Thus, in Mathews itself the Supreme Court found that "something less than an evidentiary hearing is sufficient prior to adverse administrative action." Id. at 343. The private interest in Mathews was greater than the interest at stake here. Moreover, Mathews had already established a right to disability payments, whereas Dolan is seeking that right.

Under the second factor, there are many procedural protections for a claimant seeking disability benefits and Dolan has availed herself of all these procedures except the last, which is not yet ripe. A claimant may file for reconsideration of denial, have a hearing before an ALJ, and receive review by the Appeals Council. If the Appeals Council affirms the denial, a claimant may receive review by a district court and, if denial continues, appeal through the federal appellate system. If the denial is affirmed, then the claimant may file a second application for disability. Dolan has pursued several of these options. The decision not to award benefits, then, can be reviewed as a matter of right five times before five different adjudicators.

All these procedures fully satisfy due process. Moreover, although the monetary cost of requiring an ALJ to inform a claimant of the ALJ's concerns regarding a claimant's credibility is slight, such a requirement would likely produce protracted litigation regarding the ALJ's pre-hearing perceptions of the case. For example: Dolan argues that "[a]t no point did the ALJ

inform Ms. Dolan during the administrative hearing that [the ALJ] planned to use the Function Report answers in the manner in which she did." Dolan's Br. at 27. That statement assumes that the ALJ did, in fact, plan to use the Function Report in the manner that she did when the ALJ presided over the hearing. It is entirely possible and conceivable that the ALJ did not have any such plan at the hearing, and only came to her conclusion upon later review of the evidence. If this Court were to recognize the procedural right that Dolan seeks, however, any claimant who felt that the ALJ's decision strayed from questioning at the hearing would have a right to another hearing. Such a requirement would reduce the ALJ's ability to respond to the evidence upon further review after the hearing. If, when attempting to reconcile the evidence in the record and the testimony at the hearing, the ALJ discovered a previously-unknown inconsistency, Dolan's proposed protection would either prevent the ALJ from relying on that inconsistency or would require the ALJ to hold another hearing. In either case, there is significant expense to the government, particularly considering the multiple levels of review protecting the claimant after the ALJ issues her opinion. Each of the Mathews factors, then, weighs against finding a due process right to the protection that Dolan seeks. Therefore, the ALJ did not violated Dolan's due process rights.

### D. Resolution

Having found the ALJ's conclusion not supported by substantial evidence, the issue remains of how to resolve the case. Dolan argues that her claim should be remanded with directions to award benefits or, in the alternative, for a new hearing. Dolan's Br. at 30. Ordering the Commissioner to award benefits is appropriate when there is substantial evidence in the record supporting the plaintiff's claim of disability, and reopening the record for more evidence would serve no purpose. Breeden v. Weinberger, 493 F.2d 1002, 1012 (4th Cir. 1974).

In this case, the ALJ determined Dolan's RFC based on the ALJ's credibility determination, R. at 67-69, which, for the reasons explained above, was not supported by substantial evidence. Dolan's credibility as to the degree of pain and the degree of disability is not sufficiently clear, however, to justify an immediate award of benefits. Accordingly, the decision of non-disability will be vacated and remanded to the ALJ who will be directed to re-assess Dolan's credibility based on an accurate assessment of the statements of activity contained in the Function Report and the activities that Dolan described in her testimony. The ALJ should also re-assess Dolan's RFC in light of any new credibility determination. In particular, the ALJ should consider Dolan's testimony that she has to lie down three or four times a day for 30 minutes or more, and that Dolan was unable to attend 30% to 40% of her doctors' appointments.[8] She should also consider the impact of the narcotic and other medications plaintiff takes daily on her ability to work an eight hour day. If necessary, the ALJ may hold another evidentiary hearing to ask a vocational expert a series of hypothetical questions premised on a more accurate assessment of Dolan's RFC.

### III.    CONCLUSION

For the reasons stated above, plaintiff's Motion for Summary Judgment [Dkt. No. 11] will be granted, defendant's Motion for Summary Judgment [Dkt. No. 14] will be denied, and the Comissioner's denial of benefits will be vacated and remanded for further fact-finding by an appropriate order to be issued with this Memorandum Opinion.

Entered this 20 day of November, 2014.

Alexandria, Virginia

/s/

**Leonie M. Brinkema**
**United States District Judge**

---

[8] If Dolan could only stand driving to 30% - 40% of her doctors' appointments, this would seem to call into question Dolan's ability to report for work five days a week.